The People of the State of New York ex rel. Frederick V. Strohsahl, Respondent, v. Katherine Strohsahl, Appellant.

First Department, June 3, 1927.

Habeas corpus — writ to bring up body of infant son of relator — relator was adjudged insane in 1918 and confined in New Jersey State hospital — subsequently appellant, sister of relator, took infant son into her possession — relator was discharged from hospital as "improved" in August, 1921, in care of another sister — appellant adopted infant without notice to father in September, 1921 — final order of commitment by New Jersey judge reciting that relator was insane and adjudging him to be such and directing his confinement justified dispensing with consent under Domestic Relations Law, § 111 — court, under Civil Practice Act, § 1254, cannot, upon return to writ of habeas corpus, inquire into legality or justice of final order — order of adoption cannot be attacked collaterally in these proceedings — best interests of child demand that he be retained by his aunt.

The relator seeks to regain possession of his infant son who is in the custody of his aunt, relator's sister. It appears that in 1917 the relator was adjudged to be insane in proceedings before a judge of the Court of Common Pleas in New Jersey and was ordered to be confined in a New Jersey State hospital. After the death of the child's mother, the child was taken by the appellant into her possession and cared for in an apartment in New York city. The relator was discharged in 1921 as "improved" in the care of another sister. Relator endeavored to regain possession of his son by force, and while the proceedings were pending in the Children's Court the appellant instituted proceedings before the surrogate for the adoption of the infant and those proceedings resulted in an adoption order. The order was based on a petition stating that consent of the relator was not necessary because of the fact that he had been adjudged insane and ordered to be confined in a New Jersey State hospital. Upon the allegations in the petition in reference to the insanity of the relator, consent of and notice to the relator was dispensed with under section 111 of the Domestic Relations Law which then provided that the consent of a parent adjudged to be insane was unnecessary. In 1924 the relator acting under a statute passed by the Legislature of New Jersey in that year instituted proceedings which determined that he was then sane, and this proceeding was instituted almost immediately after that determination was made.

Habeas corpus is not the proper remedy in view of the fact that the infant was legally adopted by the appellant. The relator contends that the proceeding before the New Jersey court in which it was found, without the intervention of a jury, that he was insane, and in which it was ordered that he be confined to a State hospital, did not adjudge the relator to be insane within the meaning of section 111 of the Domestic Relations Law. This contention cannot be sustained. A person may be said to have been "adjudged to be insane" without a determination pursuant to a writ de lunatico inquirendo and the proceedings in the New Jersey court did adjudge the relator to be insane within the meaning of the statute.

The order of adoption was not defective, therefore, for failure to obtain the consent of or give notice to the relator, and the order was made by the surrogate

pursuant to clear authority, and it recites all the necessary jurisdictional facts. Under section 1254 of the Civil Practice Act a court or judge, upon the return to a writ of habeas corpus, cannot inquire into the legality or justice of any mandate, judgment, decree or final order. The surrogate having had jurisdiction to make the adoption order, it cannot be attacked collaterally in these proceedings.

Furthermore, even though the adoption order were held to be invalid, *it seems* that the welfare of the infant demands that he be retained in the possession of his aunt. It appears that he is now living with his aunt in a modern seven-room apartment, is and has been well cared for, and that his health, which has been and is now somewhat delicate, is steadily improving, and it would not improve the welfare of the infant to permit the father to remove him to a three-room bungalow in the country, made of very light material and without any sanitary conveniences and with only a kitchen range for heat.

APPEAL by the defendant, Katherine Strohsahl, from an order of the Supreme Court, made at the New York Special Term and entered in the office of the clerk of the county of New York on the 23d day of October, 1926, sustaining a writ of habeas corpus herein, vacating an order of adoption and awarding custody of the infant, Vincent Strohsahl, to the relator, with notice of an intention to bring up for review an intermediate order entered in said clerk's office on the 3d day of October, 1924, denying appellant's motion to dismiss the writ.

*Charles E. Hughes, Jr.,* of counsel [*Thomas Harold Pinney* with him on the brief; *Jesse Weil,* attorney], for the appellant.

*Raymond B. Seymour,* for the respondent.

FINCH, J. This is a litigation between a brother and sister for the custody of a child of the brother. The child is now eleven years of age. The father, Frederick V. Strohsahl, is a resident of the State of New Jersey. In the fall of 1917 he suffered from an attack of dementia melancholia and was duly committed to a New Jersey State hospital for the insane under an act substantially similar to the New York State Insanity Law. Upon such commitment, the wife of Frederick V. Strohsahl went to live with her parents, taking with her the two children of said Frederick V. Strohsahl, Vincent and his younger brother, Preston. The wife died while at her mother's home and the two children continued to reside with their grandparents. In the fall of 1921 Katherine Strohsahl, a sister of Frederick V. Strohsahl, learned that the boy Vincent was suffering from diseased tonsils and adenoids and that an operation was necessary. She volunteered to take the boy and have the operation performed at her expense. To this the grandparents consented and the said Katherine Strohsahl took the boy into her care and custody, where he has ever since remained, residing with said Katherine Strohsahl in an apartment

in New York city. At that time the boy Vincent was about five years of age. In August, 1921, Frederick V. Strohsahl left the State hospital and was subsequently discharged as " improved " in the care of another sister. He thereafter sought to obtain the return of his son Vincent and, on being refused, made two unsuccessful attempts to take him by force. The latest attempt was in August, 1922, when he picked the boy up in the street and put him into a taxicab, and thereafter the boy and the petitioner and the respondent all were ordered to appear at the Children's Court and were then directed to appear one month from that day, namely, on September twenth-sixth, Vincent meanwhile being paroled in the custody of the Big Sisters, but actually remaining with the respondent. On the day before the hearing, September 25, 1922, respondent obtained an order of adoption. This order of adoption recites that it is based upon a petition and upon an order of Judge ZABRISKIE. A portion of this petition is as follows: " That the consent of the said Frederick V. Strohsahl, the father of the said minor, is not necessary because of the fact that the said Frederick V. Strohsahl is an insane person, and that he was duly judicially adjudged and declared to be insane and ordered to be confined in the New Jersey State Hospital at Greystone Park, in the State of New Jersey, by the Hon. J. B. ZABRISKIE, Judge of the Court of Common Pleas of the County of Bergen, State of New Jersey, under date of June 19th, 1918, a duly certified copy of which decree, marked Schedule 'A' is hereto annexed, and made a part hereof."

The decree referred to in this allegation of the petition is called a final order of commitment and recites that certified copies of an application made by Henry Strohsahl and the certificate of two physicians certifying that Frederick V. Strohsahl is insane and that his welfare and the safety of others require that he be temporarily restrained until judicial inquiry can be had, having been transmitted to Judge ZABRISKIE by the medical director of the State hospital at Greystone Park; and Judge ZABRISKIE having on the presentation of the original application made an order of temporary commitment to the State hospital at Greystone Park, and having directed the institution of an inquiry and that proofs be taken as to the sanity and legal settlement of said alleged insane person to be held on the twenty-ninth of May, and having on the same day issued a *capias* to a peace officer directing him to take and commit the said Frederick V. Strohsahl, which *capias* has been duly returned showing that said Frederick V. Strohsahl has been temporarily committed to the said State hospital, and it appearing by proofs of service that legal notice of the time and place of this inquiry has

been given to said Frederick V. Strohsahl, and it appearing that the condition of the said Frederick V. Strohsahl is such that it is inadvisable to produce him at this inquiry; and having deemed it unnecessary to call a jury I proceeded to take proofs on oath as to the sanity, settlement and indigency of the said alleged insane person of the following named credible persons: Dr. Daniel T. Millspaugh and Dr. William Veenstra legally qualified physicians of reputable character, graduates of an incorporated medical college, who have been in actual practice of their profession for five years and are residents of this State, who made the medical examinations set out in the certificates attached to the application and who diagnosed the nature of the malady with which the alleged insane person is afflicted as insanity; and H. Strohsahl who gave evidence as to the sanity, legal settlement and property of the alleged insane person, from all of which it appears that the said Frederick V. Strohsahl is an insane person and should be permanently confined in an institution for the insane of this State; and that he has a legal settlement in Bergen County in the State of New Jersey.

" I do, therefore, on this 19th day of June, 1918, order, adjudge and decree that the said Frederick V. Strohsahl is an insane person and that he be confined in the New Jersey State Hospital at Greystone Park until restored to his right mind and until the further . order of a court of competent jurisdiction and while so confined that he be supported and maintained at the expense of Henry Strohsahl, brother of the patient.

"(Signed)   JOHN B. ZABRISKIE,
        " *Judge Court of Common Pleas of the County of Bergen*
" Recorded this 10th day of July, 1918
  " GEORGE VAN BUSKIRK
            " *County Clerk.*"

The consent of and notice to the petitioner, as surviving parent, was dispensed with under the provisions of section 111 of the Domestic Relations Law, which then provided that " the consent of a parent   *   *   *   adjudged to be insane   *   *   *   is unnecessary." When the hearing came up in the Children's Court, in view of the adoption order, the respondent retained the child. There was no way at that time for Frederick V. Strohsahl to have an adjudication that he had completely recovered. Subsequently the Legislature of New Jersey passed an act permitting one in such circumstances to have himself judicially declared sane, which the petitioner did almost immediately following the passage of the act, namely, on July 2, 1924. In August, 1924, this proceeding was commenced by the petitioner for the issuance of a writ of

First Department, June, 1927.          [Vol. 221

habeas corpus, to which respondent made return, which return was traversed by petitioner. In August, 1924, respondent made a motion to dismiss the writ of habeas corpus on the ground that habeas corpus was not the proper remedy. This motion was denied by order entered on October 3, 1924, and respondent's notice of appeal from the final order entered herein also gives notice of her intention to review on this appeal the intermediate order denying dismissal of the writ. Said order entered October 3, 1924, denying the motion to dismiss the writ, directed a reference of the issues. The report of the referee was filed on July 22, 1926, the referee recommending that the writ of habeas corpus be sustained, the order of adoption vacated and the respondent ordered to return and redeliver the infant to the petitioner at a time and place specified in the order. The matter came on for a hearing at Special Term, and the court, after hearing all parties, by an order dated October 23, 1926, awarded the custody of the infant to the petitioner and vacated the order of adoption. From this order the respondent appeals, and also brings up for review the intermediate order denying the respondent's motion to dismiss the writ.

The first question, therefore, which is presented upon this appeal is whether habeas corpus is the proper remedy in view of the order of adoption.

If the order of the surrogate allowing and confirming the adoption was made without compliance with the statutory requirements, then it follows that the adoption may be disregarded in this proceeding. At the time of the adoption, section 111 of the Domestic Relations Law (as amd. by Laws of 1922, chap. 628) governed. It provided in part as follows:

" § 111. Whose consent necessary. Consent to adoption is necessary as follows:   *   *   *

" 3. Of the parents or surviving parent of a legitimate child; and of the mother of an illegitimate child;   *   *   *   but the consent of a parent who has abandoned the child, or is deprived of civil rights, or divorced because of his or her adultery or cruelty, *or adjudged to be insane,* or to be an habitual drunkard, or judicially deprived of the custody of the child on account of cruelty or neglect, is unnecessary; excepting, however, that where such parents are divorced because of his or her adultery or cruelty, notice shall be given to both the parents personally or in such manner as may be directed by a judge of a court of competent jurisdiction." (Italics are the writer's.)

The consent of the petitioner not having been obtained, the query is whether this was excused by the words of the statute " but the consent of a parent   *   *   *   adjudged to be insane

* * * is unnecessary." It is earnestly contended that notwithstanding the fact that the order of commitment in the case at bar recited that the petitioner had by final order 'been " adjudged to be insane," nevertheless this order of commitment would not constitute an adjudication of insanity sufficient under section 111 of the Domestic Relations Law to dispense with notice to a parent so committed. The term " adjudged to be insane " standing alone may refer to a determination pursuant to a writ *de lunatico inquirendo.* It may as well refer to a judicial order made and entered pursuant to the Insanity Law. There is nothing to be found in this section 111 of the Domestic Relations Law to call for the more restricted construction. In fact, the ordinary meaning of the words would seem the more likely meaning intended. As noted, the order of Judge ZABRISKIE was clearly a final judicial determination that the petitioner was then insane, and this is all the statute requires, giving the words their ordinary meaning. Furthermore, the words used in the Insanity Law are precisely the words used in this section 111 of the Domestic Relations Law. Section 80 of the Insanity Law provides: "A person alleged to be insane * * * may be committed to and confined in an institution for the custody and treatment of the insane, upon an order made by a judge of a court of record * * * adjudging such person to be insane * * *." (Now Mental Hygiene Law, § 70, as revised by Laws of 1927, chap. 426.)

The use of the same language in two statutes covering different aspects of one subject would seem to indicate a legislative intent to have the same language convey the same idea. Any ambiguity, however, which at the time of the making of the order of adoption existed as to the precise meaning intended by the Legislature to be given to the phrase " adjudged to be insane," was subsequently removed by the amendment in 1924 (Chap. 323) of section 111 of the Domestic Relations Law so as to dispense with the consent of a parent " who is insane as defined by the Insanity Law or judicially declared incompetent or who is a mental defective as defined by the Mental Deficiency Law." (See, also, Mental Hygiene Law [Laws of 1927, chap. 426], § 2, subd. 3; Id. § 70 *et seq.*) It thus appears to have been the legislative intention to use the term " adjudged to be insane " in its broader sense and expressly to include not only a determination upon an inquisition *de lunatico inquirendo,* but also a person finally committed upon an order of a judge or court adjudging such person to be insane. As we construe the amendment to the section, it is not an enlargement of the section, but rather a clarification of what was intended to be within the meaning of the term " adjudged

to be insane." The amendment is consistent with and explanatory of the earlier and ambiguous language " adjudged to be insane." The wisdom or the fairness of such a policy is for the Legislature and not for the court. A party under disability is not without redress, for he or she may attack the adoption order forthwith. It is also to be noted that the same legislative policy is present even in a more drastic form in dispensing with notice to the alleged insane person in the discretion of the justice where commitment is made in accordance with the provisions of the Insanity Law, which have been since revised into the Mental Hygiene Law. In such event elaborate statutory provision is made whereby a proceeding may at once be initiated if the person committed wishes to attack the commitment.

It thus appears that the order of adoption was not defective for failure to obtain the consent of or give notice to the petitioner. The order was made by the surrogate pursuant to clear and unquestioned authority and recites all the necessary jurisdictional facts. By section 1254 of the Civil Practice Act it is provided that a court or judge, upon the return of the writ of habeas corpus, " shall not inquire into the legality or justice of any mandate, judgment, decree or final order." The writ of habeas corpus brings up for review the question whether there was colorable jurisdiction to grant the order of detention. As was said by VAN BRUNT, P. J., in *People ex rel. Sampson* v. *N. Y. C. Protectory* (93 App. Div. 196, 197): "As the writ of habeas corpus is simply a writ of right, the only question brought up is the fact of the commitment." In *People ex rel. Price* v. *Hayes* (151 App. Div. 561, 563, 564) it was said by WOODWARD, J.: " Persons committed or detained by virtue of the final judgment or decree of any competent tribunal of civil or criminal jurisdiction, or by virtue of any execution issued upon such judgment or decree, are expressly excluded from the benefit of the writ. No inquiry into the ' legality or justice ' of any mandate is permitted, except as those terms include the questions of jurisdiction or power. (Code Civ. Proc. § 2032;* *People ex rel. Tweed* v. *Liscomb,* 60 N. Y. 559, 569; *People ex rel. Farrington* v. *Mensching,* 187 id. 8, 27; *People ex rel. Scharff* v. *Frost,* 198 id. 110, 115; *People ex rel. Young* v. *Stout,* 81 Hun, 336; affd., 144 N. Y. 699; *People ex rel. Patrick* v. *Frost,* 133 App. Div. 179, 185.)" When there is jurisdiction to make an order, it cannot be attacked collaterally in a habeas corpus proceeding. As was said in *People ex rel. Price* v. *Hayes (supra):* " Habeas corpus is not a writ of review, and errors of law and mere irregularities or errors of judg-

---

* Now Civ. Prac. Act, § 1252.— [REP.

ment committed by the court whose judgment, decree or process is in question cannot be inquired into or corrected thereunder. They must be corrected by the court issuing the process, or in appellate proceedings."

It follows, therefore, that the order of adoption, pursuant to which the respondent had the custody of the infant, was a complete answer to the writ of habeas corpus, and the writ should have been dismissed. Where there exists a valid order of adoption, a proceeding looking to its abrogation must be brought for that purpose.

If we approach a decision of the question here presented from another angle, we reach the same result. Assume that the order of the surrogate allowing adoption was void for want of jurisdiction because made without the consent of or notice to the surviving parent, and we may dispose of the matter as a question of fact. The issue being, as it must, the welfare of the child, we are confronted with certain facts which seem controlling. Here is a delicate young child who has had two operations for mastoid. He has lived for six years with an aunt and now lives with her in a modern seven-room apartment having all the physical comforts and attention which a doting maiden lady can bestow upon him. We are asked to order his removal in winter as well as summer to a bungalow which is heated only by a coal range in the kitchen and a hot water heater used for chicken incubators in the cellar, but from which no pipes or other means of radiation run to the bungalow above. There is also a portable oil stove. It is true that the bungalow is only one story, measuring in all sixteen feet by thirty-six feet, and has but three rooms, a combination kitchen and living room and two bedrooms connected by doors without any hallway, so that a kitchen range would be more effective than if the house were larger; but on the other hand, the construction of the house is only of thin chestnut boards covered with building paper on the outside and lined on the inside with Compo boards, and there is only an outside toilet which is necessarily without heat. In addition, there is no hot water, there being only one sink and faucet in the combination kitchen and living room, furnishing only cold water. There is no bath. Petitioner does all his own cooking and conducts his farming and road store business practically alone except for the occasional help of a girl or woman and a couple of small boys and occasionally his sister and such work as the younger son, Preston, now nine years of age, is able to do. We realize that adequate strength and growth, physically as well as mentally, can be attained only through effort, and that necessity furnishes to most natures solely the stimulus which is

First Department, June, 1927.      [Vol. 221

heeded. Self-sacrifice to spare a boy such effort is ill-judged affection. We also recognize the benefit of country life as against that in the city for growing children. These generalities, however, presuppose a physical stamina which can withstand the effort and the conditions offered. While the boy is undoubtedly stronger now, it is certainly safer for his welfare to wait for more returning strength and toughness through age before a court by order compels him to face the rigors of the winter in the bungalow described. A child to be disciplined must first survive.

The orders appealed from should be reversed, with ten dollars costs and disbursements, and the writ dismissed, with costs and disbursements.

DOWLING, P. J., MERRELL, MCAVOY and PROSKAUER, JJ., concur.

Order entered October 23, 1926, reversed, with ten dollars costs and disbursements, and the writ dismissed, with costs and disbursements.